Good morning, ladies and gentlemen. Before we begin, I'd like to note that our colleague, Justice Martina Lampkin, is not present at court today. Please be assured, however, that she is going to be here at the end of the session. She is going to review the audio of these proceedings and will, therefore, participate in the decision. Would the lawyers who intend to argue please rise and approach the podium. Please introduce yourselves. Keep in mind that the microphone does not amplify, but it does record our conversation. Please. Thank you, Judge. Colleen Murphy, on behalf of the plaintiff, Luce Rivas, and the family of Luce Rivas. Thank you, Counsel. Steve Wolfman, on behalf of the appellant, Benny's. All right, very good. It is normally our procedure to allow 15 minutes per side for argument. Would you care to reserve any time for rebuttal? Yes, Your Honor. If I only have 15 minutes total, I'd like three minutes for rebuttal. All right, certainly. And we certainly will be flexible in the event that questions are asked and that sort of thing. Very well. With that, you may begin. Thank you, Judge. May it please the Court, Counsel. Along with my associate, Siri Graham, I represent the appellant in this case, Benny's Chophouse. Before we proceed, one question I do have, and hopefully you can address this. What's our standard review here? Well, it depends on the issue, Your Honor. I believe for the two main arguments that I'm going to be addressing today, obviously we have multiple arguments in our brief. Because of the limited time, I'm going to focus on two main arguments. One is the apportionment of fault. That is a manifest late argument. The other is the trial judge's denial of my motion for directed finding, and the standard review on that issue is debatable. I submit that it should be de novo, but there is certainly an argument that it should be manifest late as well. And I'll address that when I get to that argument. Okay. So one question I have about standard review is the applicability of the Workers' Compensation Act. A question of law, in fact. Well, the applicability of the Act is a question of law. Okay. Whether the trial judge should have granted the motion for directed finding on that issue is debatable based upon the analysis under the directed finding statute. Okay. Thank you. We do have a number of issues raised in our briefs, and I would like to focus my time on two main issues, which I think are the most important issues that I saw. Is there any questions that the Justices have as we proceed forward? I would like to address the apportionment of fault issue first. That's mostly a factual issue. There is one legal point that I need to argue. When I get to that issue, we'll get to that. And then I'll try and move through that as quickly as I can so we get to the exclusive remedy argument. The standard review, as we just said, on the apportionment of fault is manifest late, which is a very high hurdle, and I'm aware of that. However, I think the evidence in this case easily meets that hurdle and that this Court should reverse the trial court's finding on apportionment of fault. The trial court found that Denny's was 60 percent at fault and that the decedent was 40 percent at fault. And I submit that once you've considered all the evidence, you'll agree with me that Mr. Revis was substantially more than 51 percent at fault, and therefore judgment should be entered in behalf of Denny's and there should be no remand in this case. There are a number of factors that I would like to discuss regarding the evidence. And the first one is Mr. Revis's own words. And I presume you've read the record, but just for a little bit of background, what happened in this case is Mr. Revis died after suffering anaphylactic shock after eating an employee meal that contained seafood. Immediately prior to that, Mr. Alfonso Villegas, who helped prepare the meal, had put the food out in a big bowl and went back into the kitchen to count steaks for the evening meal. When he came back out, he saw that Mr. Revis was going up for a second helping. He was the only person that knew that Mr. Revis was allergic, and he told him, you shouldn't have eaten that meal. It had seafood in it. Another lie detector, Juan Padilla, heard that discussion and came over. Then he talked with Mr. Revis and said, is it true that you're really allergic to seafood? Why didn't you ask me to make you something else? And then importantly, the decedent said, the first thing out of his mouth was, it's my fault, I should have asked. It's my fault, I should have asked. So we're going to apportion fault, and here we have the very decedent himself. The first thing out of his mouth was, it's my fault. Now that comes in as an admission, obviously, but more importantly, it would also come in as an excited utterance. And we all know that an excited utterance is admissible in this state and in most states in this country because it is found to be inherently reliable. The declarant doesn't have an opportunity to prevaricate, to come up with a story. It's the first thing he speaks after an incident has occurred. So therefore, it is inherently reliable, and he's saying, it's my fault. Well, I have a question, though. He had suffered prior incidents as a result of eating seafood, right?  And the record appears that it was not as severe, of course, as it was on the day of the incident. So, I mean, do we factor that in? Do we mean that, you know, his awareness of his allergy in the past was minimal with regards to his reaction? Well, whether it was minimal or wasn't minimal, he knew he was allergic to seafood and should have been vigilant about making sure he didn't eat any seafood. But whether, you know, do I think that he thought he was going to die that day? No, I don't think he thought that. But the fact remains, he knew he had the allergy, and no one else, if any, other than Mr. Villegas, knew that he was allergic to seafood. Now, what's important about this excited utterance is what he didn't say. It's important that he accepted responsibility and said it was his fault, but what he did not say is almost more important. He did not say, why didn't someone tell me? He did not say, why didn't Alfonso tell me? He didn't say that. He did not cast blame on anyone else. He acknowledged it was his fault. So that's a very important consideration in this case. The second thing I want to point out is, and this is the legal aspect of this argument, is Alfonso Villegas' knowledge should not have been imputed to Benny's. He learned of the decedent's allergy over a year ago when they were both working at the Chicago chop-off in a purely personal conversation before the two of them started work that day. The decedent told him he was allergic to seafood. After that one discussion, it was never brought up again. At that point, Benny's restaurant didn't exist. They were both working at the Chicago chop-off. More than a year later, they both get jobs at the Chicago chop-off. The decedent continued to work at the Chicago chop-off at night. He was working the lunch hour at Benny's. There was never any discussion with Mr. Villegas again about his allergy. Mr. Ribas didn't say anything to anyone at the restaurant. He did not ask Mr. Villegas to look out for him and to warn him that there was seafood in the employee meal. Nothing. I'm sorry to interrupt you, but regarding the percentage of culpability here, wasn't the trial court in a better position to make that determination? Well, I mean, that's what this is all about, Your Honor. Right. You know, I mean, to some extent you have to defer to him. Right. When you hear the remainder of my comments, I think you'll agree with me that under these set of circumstances it is virtually impossible for any reasonable trial effect, whether that's a judge or a jury, to have concluded that the plaintiff was less than 51% at fault. It's just not—I don't think it's reasonably—anybody's able to do that. That's why I think I can overcome the manifesto of the evidence standard. But Mr. Villegas didn't say anything to anyone. Mr. Ribas didn't say anything to anyone. And here we have information that was learned in a purely personal relationship more than a year earlier. To impute his knowledge to Benny under those circumstances, I think is against public policy. It places an enormous burden on a court if an employer has to anticipate that when they hire a new employee that they are charged with imputed knowledge of everything that employee knows. Just imagine the burden that would place on employers. Imagine how difficult that would be for an employer to even try to learn that information. You don't know what this person knows, and you don't know whether it might be relevant or might not be relevant. It is an impossible standard. Now, there's been some discussion—it's argued by counsel— that Mr. Villegas was a supervisor. And there is testimony that he said, I'm a supervisor. That was never fleshed out. We don't know what he supervised. There's testimony that he acted as an interpreter for the non-English-speaking employees, which wasn't the decedent. The decedent spoke English just fine. He could read, talk, understand English. So that had nothing to do with the decedent. The decedent was a front-of-the-house employee. He worked with the waitstaff in the restaurant. He was occasionally in the kitchen, just like the waitstaff was. He was not a back-of-the-house employee. Mr. Villegas was a back-of-the-house employee. So Mr. Villegas had no supervisory authority over the decedent. So imputing his knowledge to Benny's is legally wrong, I submit, and shouldn't have been done. And that would have had a substantial impact on a portion of his fault. If you believe that Benny's knew, albeit by imputed knowledge, I can see why there might be some more fault on behalf of Benny's. But Benny's didn't know. He didn't know. The decedent never told anyone, and he never even asked Mr. Villegas to look out for him or to warn him or to let him know when there was going to be seafood in the meal. The third point I would like to make is, and this is really the most startling part about the court's decision below. There was what I call phantom testimony, and I use that word to refer to it in my brief. The trial judge specifically stated on page 5 of his judgment order, next to the last paragraph at the bottom, he said that the plaintiff's expert, Mr. Parsons, that the Chicago Board of Health Rules and Regulations were violated by Benny's and that they should have had a sign or a note or a placard advising what was in the meal. Well, that never happened. And that was the pillar of his decision. The underpinning of his whole decision was this need to place a placard or a card or some type of note saying that there was seafood in it. And he relied upon Parsons' testimony that Benny's violating the Chicago Board of Health Rules and Regulations. It never happened. Further, if you look and read those rules and regulations, and it's in a book, it's on page 82 of that book. It was the only page that was introduced as an exhibit. If you just read it, it doesn't apply. It does not apply to these facts. Even if it had been considered, it does not apply to the facts of this case. It has nothing to do with an employee meal at a restaurant. It has nothing to do with meals at a restaurant. Well, what about his reference to the FDA? Okay. The FDA, Your Honor, is a model code. He reluctantly admitted this. Yeah. And it wasn't adopted until 2017. It became effective in 2019. But if you look at the provisions of the FDA, they're all very general provisions. They don't say anything about employee meals. They don't say anything about what you should do when a bowl is placed out. They're all general provisions that talk about a person in charge and having general allergy recognition training. That's it. That's all they say. Secondly, the serve safe course that they talked about, if you open the book and Mr. Parsons acknowledged this, the book says that this is not intended to be a standard or define reasonable behavior. It is not a standard. Also, Mr. Parsons never cited any provisions of serve safe at all. He just referred to it generally. He didn't point out paragraph 3 or page 2 or section, nothing, just a general reference to it. There's nothing in there about this placard or sign or card. There's nothing in the FDA that was admitted in evidence about some placard, card, or sign, nothing. The only thing that even mentions some type of sign is the Chicago Order of Health Rules and Regulations, which doesn't apply to these facts, number one, a fair reading of that Rules and Regulations. And like I say, startlingly, the judge said that Mr. Parsons testified about it, but he didn't. He didn't mention it at all in his testimony, and the reason for that is immediately before he got up to testify, I brought a motion in limine to bar him from mentioning the Chicago Order of Health Rules and Regulations because it had never been disclosed as something he relied upon to formulate his opinions. The trial judge granted my motion, barred him from mentioning it. He never mentioned it. So now you have the judge barring reference to it, no discussion of it, and it doesn't apply, yet the judge specifically says I'm relying upon Parsons' testimony that Benny's violated the Chicago Order of Health Rules and Regulations. So you're saying that there's no regulations, yet what industry standards was he referred to when he was testifying? I don't know, Judge. I mean, he was said to have violated industry standards, right? His testimony, partly, I'm paraphrasing it, was that, you know. He said industry standards. Right. But he never defined what those were. Okay. He never said what they were. I mean, this whole placard, this whole card, he didn't discuss it? I mean, he did say that they should have put a card or a sign on the placard. He said that, but he had no authority for that whatsoever. He didn't rely on the Chicago Order of Health. He didn't rely upon ServSafe. He didn't rely upon the FDA for that. He just said it. There was no authority whatsoever. I'm sure it was cross-examined. What did he say in cross-examination? What he said in cross-examination, I asked him, I said, do you know of any restaurant, any restaurant anywhere in the world, that puts out a list of ingredients next to an employee meal? He said no. No. And then he caught himself and goes, well, maybe Applebee's and Stouffer's. And I said, well, what about them? And he goes, well, they let their employees order off the menu. So I said, oh, they order off the menu. They order off the menu. They know what's in the menu. He goes, yes. So other than these two restaurants, which is unusual in the restaurant industry to allow your employees to order off the menu, other than that, he knows of no one, no restaurant anywhere that requires or puts out a card with the ingredients for the employee meal. None. So now he's got no standards he refers to, although he said it's a standard. He's got no evidence, no recollection, no nothing of any other restaurant anywhere ever putting this out. And yet the judge relies upon this as the pillar of his justification for finding babies at fault. And it doesn't exist. It's not existent. It's phantom testimony. So when he's digesting this family meal at the time, what is he? Is he an employee or not an employee? He's an employee, Judge. He's an employee, and it arose out of him in the course of his employment. And this gets to the exclusive remedy argument, which I can jump to because I know I don't have a lot of time left. But if you look at the Workers' Compensation Act, it is replete with discussions of employees being injured while on a lunch break. If you look at the Ego Discount Foods case, that goes through a lengthy discussion of cases happening on lunch breaks. Now, counsel tries to swat away the Ego Foods case by saying, well, the statute was amended after that case was decided, and the statute now says it's clear that if you're injured during a recreational activity that it doesn't arise out of employment. Well, that's their only response to Ego Foods. They don't analyze it. They don't discuss it. They don't disqualify it other than saying the statute was amended. But the statute says you can't get workers' comp if you're injured in a recreational activity. This is not a recreational activity. It clearly doesn't apply. So is the restaurant offering these family meals as a gratuitous act or out of the kindness of their heart? Or is it part of the understanding in the employment that you will be provided a family meal while you're on the premises? Mr. Parsons also testified. He was an expert. That it is customary in the restaurant industry to provide a family meal to your employees. So here's why he was in the course of it arose out of his employment. It was a lunch break. It occurred at the end of a shift. True. He had clocked out. True. These are undisputed facts. And that's the thing about this case. There are no undisputed facts. It's the application of those facts to the law. That's true. But if you look at all the analysis of the cases that were discussed in Eagle Foods and Cook County, it doesn't matter. It doesn't have to be clocked in because it's incidental to employment. It's part of the personal comfort doctrine. More importantly, the reason that they serve the employee meal after the end of the shift is because this is a restaurant. The typical lunch hour that's anywhere from 11 to 2, they're working on customers. They're serving customers. So all the employees have to wait. They can't take their lunch hour earlier. They have to wait until the employee meal, until the restaurant service is over to get their employee meal. So it benefits Venny's because their employee, they don't have to over staff so employees can take their lunch hour during their busy time. It benefits them. They delay it until after they finish the meal service, and then they eat. Plus, it's in the restaurant. It's a meal specifically prepared for the employees. It's not on the menu. It's unique to the employees, and it's done immediately after they finish their duties for the day. The plaintiff or the deceased's wife testified that he wouldn't work at Venny's until 3 or 4 every day. Well, the lunch service is typically over at 2.15, so even she said in her testimony that he works at Venny's until 3 or 4 every day. She knew that. So despite the fact that he had clocked out, that's a red herring. Him clocking out has absolutely nothing to do with the compensability of this claim. It has to do with, was the act incidental to employment? It clearly was. Was the, and now I'm getting into this, so that his clocking out had no effect on whether or not the industrial permission? None whatsoever. None whatsoever. And if you read the Eagle Foods analysis of lunch cases, it doesn't even have to be a risk. It doesn't have to be some danger associated with employment. If you look at the Cook County case, they said that the most important factor is where it occurred, and this obviously occurred on the premises of the restaurant. It was made specifically for the employees. It wasn't offered to any other patrons. Counsel said, well, this is a voluntary act. It was voluntary. It had nothing to do with employment. Well, I suppose any time anybody goes to lunch, it's voluntary that they eat. I mean, an employer can give you time to go to lunch, but the employer doesn't make you eat. But let me interrupt you just for a moment, Counsel. You distinguished between, you referenced the busyness of the staff during what would commonly be known as the lunch hour, and the fact that, in this case, the decedent took his lunch, as it were, or he ate, after he had clocked out. Yes, Your Honor. You don't see some significance between taking lunch while he is working versus now he's off. He's free to go. He's free to go. Unlike people who are on lunch, maybe he's not free to go. Just like somebody who takes the typical lunch hour in an office. They're free to go during their lunch hour. They can walk away. They can go someplace. They don't go home. I mean, this fellow, once he checked out, once he clocked out, he's free to go home. He didn't have to stay. He was. He was, Your Honor. But that doesn't mean it's not incidental to employment. Again. But the cases you're referring to are lunch hour cases. Yes. Right? Do you have any cases that say the actor on the point checks out, clocks out, or whatever it is, that it's the same analysis? Yes. The key here is not whether they were clocked out or clocked in. The key is, and if you read the cases, it's absolutely crystal clear, was it incidental to employment? I mean, there are cases where employees were injured before they clocked in. You know, they go into the locker room. They put their stuff in the locker room. They slip and they fall. Those are compensable cases because it's incidental to employment. If it's incidental to employment, that's the key. Whether they're clocked in, whether they're clocked out, doesn't matter. Whether the lunch occurred during the middle of the day or during the shift, it doesn't matter. But where does it say that? What authority do you have to say that when somebody clocks out, as you refer to it, whatever happens is incidental, regardless of the meal, is incidental to employment? There are hundreds of cases that talk about injuries occurring incidental to employment where the employee either had not yet clocked in, had clocked out, was off the work premises. The key is, was this incidental to employment? Was it a benefit to the employer? And it was a benefit to the employer in this case because Benny's was able to defer everybody going to lunch so they could work for their customers until the shift ended. So that is a key point. And I think if you read the analysis, if you just read Eagle Discount Supermarket, they go through this lengthy discussion of cases. And if you look at Cook County, in Cook County, the person was clocked out and their injury had nothing to do with the workforce, the work premises that the court held. But the key is that they were still on the premises. And Mr. Grievous was on the premises eating meals specially prepared for employees. This isn't some gentleman that was walking by and said, oh, I hear Benny's is having free lunches in their kitchen. I'm going to go in and eat. The only reason he was there was because he was an employee. The only reason he was eating it at 2.30 was because the busiest part of the day, the lunch hour, was occurring. That's the only reason. So don't get hung up on the fact that he had clocked out and it was the end of the day. It's not a relevant consideration. And this has nothing to do with this case, but I've handled thousands of workers' compensation cases in my career. I've tried hundreds of workers' compensation cases in addition to my civil practice. And the commission is number one, and we put this in our brief, is it interprets the statute very liberally to find compensation. That's the purpose of the Workers' Compensation Act. There is no negligence required. Benefits are liberally awarded. If it's a close call, the employee gets it. There is no doubt in my mind that if the plaintiff had ever pursued a hearing in the commission on this case, workers' compensation benefits would have been awarded 10 years later. So why would the West Front deny a workers' comp action hearing? Well, that's a very good question. And the basic reason for that is they had two different insurance companies. They had an insurance company for workers' comp and an insurance company for liability. I was hired by the liability carrier. The insurance company for the workers' comp denied the claim, wrote a letter back in 2013, denied the claim. In that same letter, the attorney said, please call us and we can discuss that. So this is merely a posture in negotiating, Judge. It happens all the time. Claims get denied all the time in the commission. It doesn't mean they're not compensated. So that is – and there was never a hearing. Nobody ever relied upon that denial. He was never found not to be able to get comp benefits. The comp claim is still pending. So the fact that some other – and the attorney that did this was actually an employee of the insurance company, unlike me, who might work for an insurance company, but I'm a private attorney. So don't get caught up in the fact that some attorney that's an employee of the insurance company wrote a letter saying, we're denying your claim, but hey, call us and we can discuss this other one. That's just negotiations. That's just posture. Okay. Back to my apportionment of damages. There's nothing in any of the materials that were relied upon by the court. The FDA, which was not enforcing the law, Serve Safe, the Chicago Board of Health. There's nothing in there that creates any obligation on Denny's to put up a card or a placard. And like I said, Mr. Parsons himself said he doesn't know of anyone that's done it, yet he comes into this case without any authority and says you should do that. When you look at all of this evidence, I think you will conclude that Mr. Rebus was, in fact, the best person to protect himself from eating seafood. All he had to do was ask, and he didn't. Now, there was an incident about a week before where the shrimps can't be served. Mr. Villegas, by chance, happened to see him in line and said, hey, you can't eat that. I'll make you something else. He wasn't looking out for him. There was no agreement. There was no understanding. He just said, by chance, I saw him and I made him another meal. Well, the significance of that event is that that should have been a huge red flag to Mr. Rebus, who said, hey, I've got to check. I've got to make sure. If Alfonso hadn't, by chance, seen me, I may have eaten that. But yet, a week later, he goes up and eats it, and once he ate it, he had to know the seafood. You may not be able to tell by looking at it, but everybody testified. I don't really know that. Everybody testified, Padilla and Alfonso, that it smelled like fish. It tasted like fish that had lobster bisque poured on top of it with clams. He had to know when he started eating it. He ate a whole bowl and it was going up per second. So why he did that, I don't know. And it may have been, Your Honor, like you said earlier, he didn't think it would be the dire consequences that he sustained. But the point is, we're talking about a portion of his fault. And if you agree with me that you shouldn't impute Villegas' knowledge to Binney's, what did Binney's do? They're supposed to provide a safe environment for their employees. Yes. And I'm not saying Binney's is fault-free. I'm not saying that, Judge. I'm saying when you compare Remus and the lack of credible testimony about these alleged standards of putting this card up, the trial court just brought this whole thing about you've got to put a card up, you've got to put a note up. There's nothing to support that.  Nothing whatsoever. How do you compare Binney's fault to Mr. Remus's? I mean, you can find whatever percentage you want, but it's got to be more than 51% on Remus. There's no other way around it. I don't think any legitimate trial effect would possibly have done this, and it should be filed against the manifesto evidence. Now, I'd like to move on a little bit. I know I don't have a lot of time left to the applicable bill, excuse me, remand provision, as quickly as you can. I'm sorry? As quickly as you can.  The Workers' Compensation Act is a liberal statute that's meant to provide compensation for employees when they're injured. It's very liberally construed. The plaintiff purposely chose not to pursue this. It's been pending in the Workers' Compensation Commission now for 11 or 12 years. All they had to do was ask for a hearing, and they would have got a hearing like that. It's never been pursued, because they want to pursue this case, because they can get more money. I mean, I don't blame them for doing that. I mean, you can get a lot more money in a civil case than you can in a comp act. The family is going to get comp acts. There's no question in my mind they're going to get them, and I believe the plaintiff knows that. That's why they didn't pursue the comp case. Why they didn't let it sit there. The deceit in this case was in the course of his employment, for all the reasons we discussed in our brief. The injury arose out of his employment. This meal was made for employees only. It was immediate. It wasn't on the menu. It was given to the employees in the kitchen of the restaurant immediately after they stopped working for the day. There's no question it arises. All you have to do is look at the allegations of the Third Amendment complaint, which is the operative document, and the trial judge summarized them at the top of page 2 of the judgment order. If you read those, all of the allegations are all employment practices. You didn't have this policy in order. You didn't do this. That is part of the employment. You can't look at those allegations and conclude that this is just some guy that ate seafood and had an allergic reaction. Judge Cushing in the trial court said that the risk here under the workers' compensation analysis was the risk of eating seafood. Well, that's a myopic view of the issue. It wasn't the risk of eating seafood. According to the allegations of the plaintiff, it was the defendant's failure to have had these policies in place. That is an employment risk, and that is a workers' compensation claim. So when you look at the manifesto, you consider whose fault really was at issue here. You look at the lack of any credible evidence about any standard requirement, a card or a placard. You look at Judge Cushing's decision where he said that the plaintiff's expert gave this testimony that is nonexistent because he barred him. There's just nothing there to support this decision. It was a workers' comp claim. It is a workers' comp claim. The act applies. This case should have been dismissed at trial because it was barred by the exclusivity for whom, and we shouldn't be here. But when you consider all of this evidence, I think you'll agree with me, Judge. Thank you. Thank you. Thank you. Counsel. May it please the Court. Good morning, Judges. My name is Kelly Murphy, and I'm here on behalf of the plaintiffs with my partner, Rick Grossman, and Trial Counsel Jeff Kroll from Kavanagh and Kroll. So before we start, I want to ask you the same question. What's our statement of review here? Manifest rate of the evidence, Judge, on almost all issues. A few of them are abuse of discretion when it comes to witness testimony. Judges, I first need to take a brief moment to clarify some of the facts that Mr. Wolf presented to the Court. Benny's opened for business to the public on April 5, 2010. Angel Rivas died April 12, 2010. Immediately after his death, judges began an investigation to determine if the Workers' Compensation Act applied. They took statements of the employees, they reviewed the employment file, and they concluded that the Workers' Compensation Act did not apply. They paid no benefits to this family. They paid no funeral expenses to this family. And as a result, on April 12, 2012, plaintiff filed the Nyquilton's case against Benny's. So just going back for a moment, the Workers' Comp Act was deemed not to apply. What was the basis for that determination? Two bases, Judge. Benny's attorney wrote a letter to the plaintiff's attorney. May I back up one step? Plaintiff filed a workers' compensation claim in the alternative at the Industrial Commission on the eve of the statute of limitations in 2013. They did that to protect the statute. And at that time, Benny's again denied the workers' compensation claim. And they did so in writing. And then they did so in an affidavit. And that affidavit is an admission by the party. And they said in that affidavit that the Workers' Compensation Act doesn't apply because the injury did not arise out of his employment and was not incurred in the course of his employment. And they relied on the case of Rodin v. Industrial Commission for support. Now, that is found in the record at page 1887. You're going to see an affidavit by Mr. Havlib, the workers' compensation attorney, stating exactly why he denied this claim. That is an admission by a party. That can be held. That was held in Townsend to be an admission. And that admission can be used against them to defeat the motion for directed verdict. The law is clear on that. What about counsel's point that that's just costume, that's lawyers being lawyers? Well, we all know lawyers and statements have consequences. And in this case, the defendants had two inconsistent statements by two lawyers, and they knew exactly what they were stating in those inconsistent statements. The case is cited by a defendant saying, hey, that's an equitable factor, so judicial estoppel shouldn't apply. Those are bankruptcy cases by laypersons. These are statements by lawyers, and they have consequences. So Rodin says that exposure to allergen is a personal risk. Is that what we have here? Absolutely, Judge. Rodin is completely analogous. And, in fact, the trial court talked about Rodin extensively, and they tell this court that they reviewed all of the cases submitted to them by Mr. Wolf. And in that review, they still found that the personal risk applied here. And the reason why it applies is fairly obvious. A person with an allergy has an allergy. They walk around with it. They walk around with it whether they're at work, at home, at school, at a picnic, wherever they may be. They have this allergy. It is personal to them. It's not related to their employment. So, therefore, it's a personal risk, and that's why he held it's a personal risk to Mr. Revis. He has this everywhere he goes. And that was the court's reasoning in Rodin. It's not related to his employment. It's personal. I want to get back to the facts just for a moment to clarify a few of Mr. Wolf's points. And prior to this case proceeding at trial, the plaintiff presented two motions. And the first motion was a motion for judicial notice of the various rules and regulations and statutes that applied. Part of those judicial notice requests included the Chicago Board of Health rules and regulations. The court took judicial notice of that regulation. And your honors will see that in the record attached in 1901 to 1917 are the exhibits of the laws that apply in this case that were accepted as a judicial notice. And in there you're going to be able to see that the Chicago Board of Health rules and regulations that was passed in 1997 stated that a person who puts out bulk food for self-service must label it with a common name. For example, lobster bisque, or they could write seafood. That burden to do that was not great. And that was required by the Chicago Department of Public Health since 1997. That's what this person. I'm sorry to interrupt. Does that apply to consumers or does that apply to employees? Great question. I'm glad you asked that. The code and, of course, plaintiff's experts specifically stated that these rules and regulations don't apply to just one specific person. They apply to everybody. People are people. That's what Mr. Parsons said in the stand. These regulations apply to all consumers. And, of course, I'm a consumer whether I'm eating food in the break room of this court or I'm a consumer whether I walk into Topo Gigio and have the conchiglio start up for the day. And I know my Italian is terrible, so I said that wrong, but that's how I say it. So, anyways, you're a consumer whether you're in the restaurant and you buy the food or you take it to go. You're still a consumer whether you're an employee or a patron. You are a consumer, and these regulations are meant to protect you. So, in addition, in the motion for judicial notice, we also set out the FDA regulations that were applicable, and one of which was the Section 3602.11, and that was set in full, full form. There was not an abbreviated form that was given to the court. There's no prejudice because of that. The full codes were given to the court, so the court, as the interpreter of the law, can look at those regulations and those laws and those rules and apply them to the facts. That's the judge's job, not necessarily the witnesses and the experts. The judge interprets the law based on the facts he heard from the witnesses, and that's exactly what Judge Cushing did in this case. The other motion that was presented prior to trial was a motion to bar the defendant, Benes, from using the exclusive remedy provision as an affirmative defense, and that was based on judicial estoppel. Argument was for 47 pages in the record, and during those 47 pages, at the end of it, Mr. Wolf specifically asked the court to reserve their ruling on the motion and to take the case on the merits so that this issue can finally be decided. After consideration, the court came back and agreed. He reserved ruling on whether or not the exclusive remedy provision should be barred based upon the affidavit of Benes and the inconsistent statements by Mr. Wolf in his affirmative defense that the act did apply, so they were conflicting. So the court reserved ruling on that. But, in fact, the court never actually ruled on Benes' motion because they found that the defendant did not prove his affirmative defense. Sorry, I need a little bit more water.  So that gets us to the workers' compensation defense. At the close of evidence, after Mr. Wolf presented testimony by his expert to the court in his evidence step, and after Mr. Padilla was on the stand, Mr. Wolf presented a motion for a directive verdict under 2-1110. First, that motion should fail because he waived it by presenting evidence before he presented his motion. Law is clear on that. The plain language of the rule in Panko v. Singh says if you present evidence or argue evidence in support of your motion, the motion is waived. Mr. Wolf did argue that evidence in this appellate brief at page 14 and 15 of his own expert's testimony, so it should be waived. Assuming you don't discount this argument and waiver, it's clear that Mr. Wolf failed to prove the exclusive remedy defense for two reasons. One, the accident does not occur in the course of Mr. Rivas' employment. Illinois has held repetitively that course of employment means did the accident occur within the time period of work. It is important that Mr. Rivas was clocked out. You were right. He was clocked out when he went in after his duties were over. The meal's not even served until the duties were over. After his duties were over, he clocks out, and he eats a gratuitous meal because this man makes $22,000 a year. He was punched out. He was not on a lunch break with any intent to go back to work, like the defendant's case is site. And they never got out. Going back to the defendant's argument, though, he says it's the policy. Was there any policy ever submitted to indicate that in restaurants, you know, this is done, that, you know, you work and then you're provided a meal afterwards because you want to take care of your customers? Right, Judge. There is no policy that you're given a meal. In fact, every restaurant is a little different, although it's custom that some restaurants do this. And Mr. Parsons actually said that. He said it's custom that restaurants might provide a meal, but not all restaurants do it the same. And in this case, if you're going to put out bulk food for self-service, according to the statute that the judge read because of judicial notice, and Mr. Parsons specifically testified about this, that industry standards at page 559 of his testimony, industry standards require you to put a label on bulk food if it's self-service. And the witnesses said, yeah, that's common sense. That wouldn't be a big burden for us to do. We could put a label out. It would have taken seconds. What industry standards was he referring to? When Mr. Parsons testified, he talked, and so did Mr. Nelkin, the defendant's expert, extensively about what the industry requires about all employees must be trained on allergens. That's number one. And how are they trained? Well, they're trained by this book called Serve Safe. And Serve Safe is this program that both Mr. Nelkin and Mr. Parsons teach to restaurant employees all over the country. Mr. Parsons actually worked a lot in Chicago. He worked at Wendy's. He worked at some Boston Market, which actually had food out on display that they would label. And he talked about the fact that the food must be labeled according to industry standards. He did steer clear about citing any specific code section based upon Revis 1's ruling, just to steer clear of that, because the court, Mr. Parsons, and the plaintiff's attorneys were very aware of that. And we specifically did not want him to give code citations. But he did testify extensively that this is what the industry standard requires. So the fact that Mr. Wolf says he didn't, it's not true. Look at page 559 through 561. In fact, when counsel got up here, he told you that Mr. Parsons said, no industry standards requires labels on this kind of food. Well, that's not what Mr. Parsons said. Mr. Parsons says that he works at the largest grocery store in the state of Pennsylvania and that they put labels on all of their food that they serve for self-service. He said it's required by the FDA and the industry standards to do that. That's what Mr. Parsons said. And he said it's industry standard because Serve Safe adopts the FDA. He did not cite a specific code on that, just that it's industry standards. Getting back to the reasons why the motion for a directive verdict was denied and then the Work Comp Act doesn't apply, the accident also didn't arise out of the course of an employment. And the reason why that's true is this court in 2020, I'm sorry, the Supreme Court in 2020 held in McAllister that an injury arises out of employment duties if the employee is engaged in the assigned job duties at the time of his injury. Mr. Rivas was a busboy. Eating a gratuitous meal after a shift, after he was punched out and could voluntarily leave, was not an assigned duty. Therefore, the injury did not arise out of his employment duties like McAllister says you have to do. But more importantly, the court said that this is a personal risk. They followed Roden. They said that Angel lived with this risk and therefore it didn't arise out of his employment. Last thing, most importantly on these two points is the affidavit. The affidavit is proof of an admission by the defendant that this accident didn't arise out of Mr. Rivas' duties as a busboy and didn't occur in the course of his employment. The affidavit is found at page 1887. The defendant tries to argue some defenses. Personal comfort, a neutral risk, EGLE. The personal comfort doesn't apply here. EGLE has nothing to do with a personal risk case like this one is. EGLE was a 1980 case where the plaintiff was a third shift employee at a grocery store. It's 2 a.m. and the employer opens up the parking lot so they can run around and get refreshed. The arbitrator, the trial court, and eventually the appellate court ruled that it wasn't against the manifest weight of the evidence that the employer allowing their employees to go run around at 2 a.m. to refresh themselves before they went back to work was not against the manifest weight of the evidence. So they did not overturn it. So it takes us back to the argument that even if these defenses the defendant likes to throw out there, oh, there should be personal comfort, oh, this could be compensation, this could be it's not incidental, those still require that the defendant still prove that the accident arose out of or in the course of an employment. Even if this court buys into his defenses and says, oh, Roden doesn't apply, those defenses still require him to prove those two factors, and he didn't do it. He can't do it because the manifest weight of the evidence proves otherwise. That brings me to the other point that even if you think the trial court made a mistake in applying those factors, that mistake, a law of fact, is not grounds for reversal. The evidence supports the verdict and the judgment in this case anyway because he has to prove those two factors. When you look at Buckner v. Causey, it's clear. Even if there's a mistake by the trial court, if the verdict can be sustained on other grounds, the verdict stands. Do you have any questions on the workers' compensation in any way? So if I understand what you're saying, that even though he clocked out and he avails himself of the family meal, that it's not automatically in the course of employment? Right. In fact, there's a lot of case law on that. Specifically, I'll draw your attention, most defenses cases are workers' compensation cases. They're not negligence cases like this case is. But there are a few out there. Martin V. Crowley is exactly on point. In Martin V. Crowley, the plaintiff went to a union meeting and left her place of employment. She came back to get her car, and when she came back into the employer's premises in the factory, she slipped on some water and was injured. The court said she's allowed to proceed with her negligence case because just because you're on the premises of the defendant's business, Illinois is not a positional risk doctrine state. And just being on the premises does not make it work, huh? She was there for her own benefit and voluntarily there. This is factually analogous to Martin. He was there for his own benefit at that point in time. And just because he was on the premises does not mean that it's work, huh? So it takes it out of the course of employment. That's being offered gratuitously, then, is what you're saying to employees after they check out? Oh, yes, absolutely. Even if they think he argues that this meal is part of his compensation, which I think he tries to do to you, if you look at Pickett v. Industrial Commission, even if you're paid for doing an act, if the act is voluntary, it is not covered by the act. That's why it's important that EGLE was before the amendment. Pickett is after the amendment. Pickett says a sheriff who was playing basketball and going to other sheriff departments to play against other teams, even though he was paid for playing and was injured, it's not workers' compensation because he was doing the act voluntarily. So compensation has nothing to do with the analysis here. And there's no evidence it was compensation anyway. Certainly, the two witnesses that worked for Benny's both testified it wasn't compensation. Specifically, Mr. Villekas adamantly said this isn't part of his compensation. He could have called an employer and put him on the stand to say that, but he didn't. There's no evidence this was compensation. And then I'd touch on a couple other points. I'm not sure about my time, but some things that are important are his argument that the court improperly imputed negligence to Benny's because Mr. Villekas' knowledge of this allergy was personal. That argument fails. The court here found first that Benny's was directly negligent. His own witness conceded that Benny's was negligent because they didn't train anybody, and it was required to be trained, that they were required to be trained. But the court wrote, while Mr. Villekas' knowledge of Mr. Revis' allergy is not in dispute, that knowledge is not essential for the court's finding that the defendant was negligent. There's ample evidence in the record that both direct and circumstantial evidence supports the proximate cause of Revis' death as the defendant. That can be found at page 2741 of the record. Now, we know also that Mr. was mistaken by this argument because the law and the IPI. Kirovalas and Kampen in 5001 series clearly states that the actions of an employee can be imputed to the employer, especially where the employee has knowledge, and that knowledge is clearly present at the time he's in the scope of his employment and duties. Here, Villekas himself testified at page 921 that he had knowledge of Angel's allergy while he worked at Benny's. That's it. It's over. He admitted it at page 921. Of course, the court goes on to say he has to manifest this knowledge because five days before, he warned him of shrimp in a meal. In regards to the issue of knowledge, doesn't the individual who is aware that they have an allergy have some responsibility with regards to what they suggest? Absolutely. I agree with you, Judge. They do. And the court thought about that, right? Because counsel claims, oh, Mr. Rivas said it was my fault, but after Mr. Rivas said that, you're going to see in the record, he ran to the sink. That's the first thing he did. But we also know that he became – initially, he didn't know what he was ingesting. He became aware of it, and not only did he have one bowl, but he had two bowls, right? No, he didn't. He did not eat – I'm sorry, Judge. I don't think that's the facts you're going to see in the record. Okay. Mr. Rivas ate the bowl, and this is supporting the evidence. Mr. Rivas self-served himself some pasta out of the dish. It was lobster bisque poured over the noodles. If you've ever had lobster bisque, there's no shellfish you see in lobster bisque soup. And the testimony says there were no chunks of lobster in it. He consumed the meal, and he was bringing up his plate, and that's when Mr. Villegas came out of the cooler, because nobody was standing near the meal, and said, you can't eat that. And that's when Mr. Rivas ran and washed out his mouth and his hands and tried to circumvent any problems from occurring. But Dr. Rangelovich, the expert pathologist in this case, testified that you might have just a minor reaction the first time, but it's the second time and the third time that your IgE develops more antibodies to cause swelling rapidly. He didn't know this was going to happen. So he did have a second bowl then? He did not. He did not. And also, the evidence is clear when you do look at Dr. Rangelovich's testimony and the autopsy pictures which are attached. She testified that the food in your stomach after you consume it does not digest when you die. Mr. Rivas died fairly quickly. And she looked at the photos of the food in his stomach, the contents, and there was no visible chunks of shellfish of any kind. What about the issue about him refusing to take Benadryl? So Benadryl, so that would go to mitigation, I assume, Judge. But Benadryl, as a mom of severely anaphylactic children, Benadryl is not the course of treatment. Dr. Rangelovich testified to that. And Benadryl in rapidly developing anaphylactic reaction from shellfish like lobster, which is one of the most potent shellfish allergens, is more rapid. And Benadryl would not have been able to prevent this type of anaphylactic reaction. And was Mr. Rivas aware of that? I mean, is there evidence in the record that he was aware of that? The evidence in the record is that Luce and Angel were very careful not to have shellfish in the house. They were very careful never to eat seafood. Mr. Villegas also testified that Mr. Rivas was careful not to eat seafood. And so the fact that this one time it happens. He'd been working in this industry for over 20 years. This one time it happens, it was fast. It was unbeknownst to him that it would be this fast. And it was not obvious there were shellfish in the meal. So just going on to the in- But if he was on Benadryl, did we know that he knew that Benadryl wasn't going to do him any good anyway? Well, there was no Benadryl. There wasn't? No. There's no evidence that there was Benadryl or any kind of first aid kit handy. And in fact, the employer ran to another restaurant. This restaurant was only open for a few days. The employer ran to another restaurant next door, Shaw's Crab House, to get some EpiPens. Because they didn't have them. And there's no proof that that was required by them at the time. It is now, thankfully. But at the time, that was not necessarily a requirement. Some restaurants, and Mr. Parsons testified, some restaurants did. But that's really not a main issue here. But just getting back to that negligence, comparative negligence fault argument. Judge, your case in Racky v. Barfor is clear. The court should not substitute its judgment, the appellate court, for that of the trial court, who is in the best position to determine the comparative negligence in this case. Judge Cushing took copious notes throughout this trial. He heard this testimony. And he found, even after hearing Mr. Revis tell his co-workers, oh, it's my fault, don't worry, trying to pacify them. Even after he heard that testimony, he still found Benes 60% at fault. And I think his opinion even says, Benes was in the position of power here. They knew they were supposed to abide by certain regulations and safety standards in the industry. And they didn't do it. Mr. Revis survived all his life with this allergy until this moment in time. All they had to do was label it. I'm just checking my notes here to see if I've touched on the things that Mr. Wolf addressed the court with. I'm sure I'm missing something. Fandom testimony. That's the last thing I really wanted to talk about. We touched on Brechner v. Causey. I'm not sure if you're familiar with that case. But that's a case where some plaintiff's attorneys from Petrillo or Warrior Insurance Group forgot to notify their client of a trial date. And, of course, the client doesn't show. They notified him very late. The client doesn't show. And as a result, a verdict was rendered against him. And the insurance company argued that there was non-cooperation so they don't have to pay. So the court then the underlying defendant files a lawsuit against the insurance company. And the court held, hold after the trial to hold the insurance company responsible, that the attorneys violated the ARDC rules and the non-cooperation clause doesn't apply because they notified him late. Well, turns out the ARDC rule was not an issue in the case, even though the trial court said it was in its verdict. But the fact that there was a mistake in the verdict does not mean that it's grounds for reversal. Much like the case in Horton-Bruckner, here any argument that because the court wrote in its 17-page fact section of its verdict that Mr. Parsons testified about the Chicago Board of Health Rule and Regulation, that does not mean the verdict should be reversed. The court also said in the line right before that portion, and that can be found on page 2738 of the verdict, Judge, if you're looking for it, that the violations of recognized industry standards, regardless of whether Illinois has adopted those provisions, was a substantial cause of Rebus's injuries and death. So the fact that he cites this in the fact section is not a reason to reverse this verdict. And, in fact, as you know as judges, it's the judge's job to interpret the law, not the plain witness, not the expert witness. The judge decides the law. And that's why it was given to the judge under judicial notice, so he could decide the law. And then, of course, his law and legal analysis section makes no reference to that. He says in that section that Mr. Parsons merely testified about industry standards. So there's no mistake here that would require reversal. I may be out of time. Is there any additional questions? No, no. Thank you, Judge. Thank you. Counsel, I'll give you a few moments. I've got a lot of stuff, Judge, so I'll try and blip through this. Yeah, I'm going to touch on the last thing Counsel said. Just because the judge made a mistake, there's no basis for reversal. This wasn't just a mistake. The very underpinnings of his ultimate conclusion was that then he should have had a card or poster or some type of note out. He relied upon the Chicago Board of Health and Wellness Regulations, as testified to by Mr. Parsons, plaintiff's expert, which didn't exist. This wasn't some ancillary issue that he got wrong. This was the very heart, the very foundation, the very essence of his decision, and it was wrong. So I just wanted to make that point. And then we've got Parsons setting these industry standards without identifying them. And then the important thing is, Judge, as I said in my initial remarks, he testified that he doesn't know of any restaurant anywhere in the world where an employer puts out a note or a card or a sign by an employee B.O. He's saying this is a standard, but nobody does it. The FDA didn't apply. It hadn't been adopted. The CERF said he didn't cite any provisions in it. He says industry standards without identifying those industry standards. The court relies upon the Chicago Board of Health and Wellness Regulations, which on its face doesn't apply. You should really read that document. It doesn't apply. But he didn't read it. The expert didn't rely upon it. He couldn't because the judge had bought him. Yet he made that the very underpinnings of his decision. The counsel said the Martin case is right on point. The Martin case, a woman left work for the day, went someplace, had dinner, I don't know, whatever. She came back to pick up her husband, and she fell. So the court didn't realize that at the time. Well, clearly that case is not on point. The counsel argued it was directly on point. It's not on point at all. She wasn't there doing anything other than picking her husband up, and she slipped and fell. So clearly it did not arise out of on point. In this case, we have a man that's standing in the kitchen, eating an important meal made specifically for employees at the end of his shift because he couldn't eat lunch during the regular shift. If you look at the analysis of the lunch cases in the Evo Foods case, you'll see that these cases are found compensable all the time. Counsel makes a reference to 602.11 under the FDA. 602.11 was the issue of the first appeal. And in this case, counsel was using, during the evidence definition of my client, a version of that that truncated a subsection D. Subsection D guts subsection C, which is what counsel wanted to rely on in the first case. If you read subsection D of 306.11, it says that the rule does not apply if the food was made in a retail establishment. That's exactly what was made here. This is food made by Benny's and served to his employees. That section doesn't apply at all. And it wasn't considered by the court. And the court didn't consider any statutes because the expert didn't rely upon any. He didn't mention it. He mentioned the FDA, which had some very general requirements that weren't met. But the FDA had not been adopted in Illinois until 2019, nine years after this occurrence. When this occurrence happened in 2010, the practices in the restaurant industry in terms of allergies were in their infancy. I mean, look about now. You go to restaurants. I'm sure you go to restaurants. Occasionally, you'll get a server ask you about allergies. It's still not taken hold. They should be doing it, but there's still nothing specific that talks about employee meals. Nothing. There's nothing written anywhere. Now, Mr. Parson said, well, the statutes talk about consumer. So he interpreted that very broadly, meaning anybody that consumes the food. I understand that argument. My point is there was nothing that said to Benny's, you need to employ this rule. When serving an employee meal, do X, Y, and Z. There's nothing out there. And if you look at the Chicago Board of Health Regulations, you've got to read it because you'll read that and say, this doesn't apply to this case. It just doesn't. And counsel argues this isn't compensation. I didn't argue it was compensation. I said it's a benefit of his employment, which is different. And this clearly was a benefit of his employment. Why was he there? People off the street don't come in and grab this free lunch. It's there for the employees after their shift. Is it a benefit of employment? And it's a benefit because they have to forego eating during the normal lunch hour. And counsel's arguing about this amendment to the statute and the case where the guy's playing basketball. It limits compensability for people participating in recreation. This is not a recreational activity. Oh, and you asked Judge Bob whether he had a second bowl or not. Counsel's right. He didn't have a second bowl. What the testimony was is when Mr. Villegas came out of the cooler, the deceased was going up for a second bowl. Okay. He didn't eat one. He saw him with his empty bowl going back up, and he stopped him. Counsel, you're going to have to wrap up. Okay, Judge. All right. The last thing I'll say, Judge, is this is not a personal risk. At best, it was a neutral risk, but I believe it was an employment risk. And if you just look at the allegations of the complaint, that's all the plaintiff alleges is employment activity on behalf of Benny's. This wouldn't have happened if all of the employment things that they allege had occurred had been done. He did have an allergy, but it was an employment risk that resulted in him consuming the food. Thank you for your time. Thank you. All right. Thank you, ladies and gentlemen, for an interesting case. You shall get a written decision from us in a reasonable length of time. With that, we stand adjourned.